**SO ORDERED.**

**SIGNED May 19, 2008.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

IN RE:

| | |
|---|---|
| AMERICAN INTERNATIONAL REFINERY | CASE NO. 04-21331 |
| AMERICAN INTERNATIONAL PETROLEUM | CASE NO. 04-21332 |
| Debtors | Chapter 11 |

----------------------------------------------------------------

JASON SEARCY, TRUSTEE, ET AL

    Plaintiffs

VERSUS                    ADV. NO. 06-2018

JAMES KNIGHT, ET AL

    Defendants

----------------------------------------------------------------
REASONS FOR DECISION
----------------------------------------------------------------

    The present adversary proceeding was commenced by American International Petroleum Corporation ("AIPC" or "Debtor"), American International Petroleum Kazakhstan ("AIPK"), and Jason Searcy as

the Trustee of the American International Petroleum Corporation Liquidating Trust (the "Trust"). Mr. Searcy subsequently withdrew and Robbye Waldron was appointed Trustee. Plaintiffs assert an array of fraud, contract, fiduciary duty, conversion, and federal and state fraudulent transfer claims against defendants Bridge Hydrocarbons LLC, Petrocaspian, LLC, Caspian Gas Corp., Lemington Investments, LTD., Baring Vostock Capital Limited Partners, Bank Turanalem, and seven former officers and directors of AIPC (collectively, "Defendants"). Most of the defendants filed motions to dismiss and/or motions for more a definite statement under rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure (collectively, the "Motions"). On October 1, 2007, the court entered an amended order ruling on the Motions as follows:

(1) James E. Knight's Partial Motion to Dismiss Original Complaint and Motion for More Definite Statement ("Knight's Motion"), Defendant Daniel Kim's Motion for More Definite Statement, Motion to Compel Initial Disclosures and Incorporated Memorandum in Support ("Kim's Motion"), Motion of Defendants George Faris, William Smart, Donald Rynne and John Kelly to Compel Initial Disclosures, Motion for More Definite Statement and Incorporated Memorandum ("Faris' Motion"), and Motion of Defendants Bridge Hydrocarbons LLC, f/k/a Petrocaspian, LLC and Caspian Gas Corp. to Dismiss Certain Claims and For More Definite Statement ("Bridge Hydrocarbons' Motion") were granted in part and denied in part without prejudice;

(2) the request for a more definite statement pursuant to Rule 12(e) as set forth in the Motions was granted in part with respect to Counts 1, 3, 6, 7, 8, 10,11-13, 16, 20, 22,

-2-

23, and 24, on the grounds that the
allegations in Plaintiffs' Original Complaint
(the "Complaint") that refer to the officer
and director defendants collectively as a
group do not comply with Rules 8(a) and 9(b)
of the Federal Rules of Civil Procedure, and
should be amended to allege the wrongful
conduct attributable specifically to each
individual officer and director defendant;

(3)   the request for a more definite statement
pursuant to Rule 12(e) as set forth in the
Motions was further granted in part with
respect to Counts 1, 3, 6, 11, 12, 20, 22, 23,
and 24 on the grounds that the allegations of
fraud in the Complaint do not comply with Rule
9(b);

(4)   Kim's Motion to Compel Initial Disclosures was
denied without prejudice on the grounds that
this request was premature given the court's
ruling on the Motions;

(5)   Knight's and Bridge's Request for Judicial
Notice was denied to the extent that it seeks
judicial notice of documents filed in AIPC's
bankruptcy case; and

(6)   in all other respects, the relief requested in
the Motions was denied without prejudice.

After further consideration, the court will modify its October 1st

order as follows: (1) the court's ruling with respect to the fraud

allegations that refer to the officer and director defendants

collectively also applies to the allegations of fraud that refer to

the other defendants collectively as "Defendants"; and (2) the

court will grant Knight's and Bridge's request that the court take

judicial notice of certain pleadings filed in AIPC's bankruptcy

-3-

case. The following constitutes the court's Reasons for Decision. An amended order incorporating these modifications will be entered contemporaneously with these Reasons for Decision.

## BACKGROUND

### 1. **AIPC and AIRI**

AIPC historically carried on its operations through wholly-owned subsidiaries. Through its subsidiaries, AIPC refined crude oil feed stock, produced, processed and marketed products at its Lake Charles, Louisiana refinery, and engaged in oil and gas exploration and development in western Kazakhstan. Debtor AIRI is a wholly-owned subsidiary of AIPC. AIRI, in turn, owned the Lake Charles refinery. According to the Debtors' Disclosure Statement, none of AIPC's subsidiaries were conducting any ongoing operations as of the date AIPC and AIRI filed for bankruptcy relief.

### 2. **AIPK**

Plaintiffs' claims center on one of AIPC's non-filing subsidiaries, AIPK. AIPC formed AIPK to hold assets related to its exploration and development activities in Kazakhstan. At the time the bankruptcy case was commenced, AIPK's primary assets were (1) a gas concession for the Shagyrly-Shomyshty gas field in Kazakhstan ("License 1551"); and (2) 95% of the outstanding shares of Too Med Shipping Usturt Petroleum Limited ("MSUP"), which in turn owned 100% of another Kazakh concession ("License 953").

-4-

### 3. <u>The Challenged Sale of AIPK's Assets to Bridge</u>

Plaintiffs' fraudulent transfer claims center on a pre-petition sale of certain assets held by AIPK to Bridge. In October 2003, Caspian Gas Corporation ("CGC") was created as a wholly-owned subsidiary of AIPK, and License 1551 was transferred to CGC. Complaint at ¶ 36. In January 2004, AIPC and AIPK transferred 85% of the outstanding shares of CGC to Bridge for approximately $5 million. Complaint at ¶ 38. As part of the agreement, Bridge was to maintain a $50 million line of credit and obtain $189 million in financing for the development of License 1551. Complaint at ¶¶ 38-39.

Plaintiffs allege that Bridge did not maintain the line of credit, nor did it obtain financing for the development of License 1551. <u>See</u> Complaint at ¶ 39. Plaintiffs also allege that approximately $500,000 of the sale price was paid to defendant Lemington Investments as a commission. Complaint at ¶ 40. Plaintiffs further allege that defendant James Knight, the President and Chief Operating Officer of AIPC, resigned his position with AIPC and took a position as president of CGC (which was then 85% owned by Bridge) in February 2005. Complaint at ¶ 17.

Although the financial statements and schedules filed by AIPC in the bankruptcy case identify AIPK as the owner of CGC, Plaintiffs contend that AIPK's assets "were held by AIPK as the

-5-

trustee, nominee, and/or agent of AIPC," and that any assets held by AIPK "were held by AIPK in name only." Complaint at ¶¶ 29, 31. Plaintiffs also allege that "AIPK was a mere conduit and alter ego of AIPC," and that AIPC and AIPK "operated as a single business enterprise, sharing officers and directors." Complaint at ¶ 30.

### 4. AIPC and AIRI File For Relief Under Chapter 11 and Sell AIPK's Remaining Stake in CGC and License 1551

AIPC and AIRI filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 7, 2004, and the cases were administratively consolidated. On December 12, 2005, AIPC filed a motion under 11 U.S.C. §363 requesting court approval to sell AIPK's remaining 15% stake in CGC to Polgraft Oil Ltd. (which is not a party in this case) for $16 million (the "Motion to Sell") [Docket No. 267]. Although the motion sought court approval under section 363(b) and 363(f), the Motion to Sell alternatively requested a determination by the court that the sale was not subject to court approval because AIPK was not a debtor. In support of the Motion to Sell, AIPC represented that the Kazakh government had threatened to seize AIPK's assets, and that if the government followed through with its threat and seized AIPK's assets – namely, its remaining stake it CGC and License 1551 – AIPC's estate would be rendered "valueless." Motion to Sell at 3. The Motion to Sell acknowledged that "AIPK's fiduciary obligations may not be

-6-

identical to AIPC's," but noted that GCA Strategic Investment Fund Limited ("GCA") was the primary creditor of both AIPC and AIPK.

AIPC filed an amended motion to sell on January 12, 2006 (the "Amended Motion to Sell") [Docket No. 298]. The Amended Motion to Sell revealed that AIPK had received a previous offer to purchase its remaining stake in CGC for $10 million, but that the offer was rejected because "AIPK did not believe that was a fair price." Amended Motion to Sell at 3. The motion further stated that "AIPK's interests constitute substantially all of the value of AIPC," and that the sale "guarantees payment to virtually all" allowed claims. Amended Motion to Sell at 2.

After a hearing on the matter, the court entered an order on February 9, 2006, approving the sale of AIPK's remaining interest in CGC under sections 363(b) and 363(f) (the "Sale Order") [Docket No. 349]. The court found that the purchase price was "reasonably equivalent value and fair consideration under the Bankruptcy Code and any applicable non-bankruptcy law." Sale Order at 4. The court also found that the sale was "in the best interests of AIPC, its estate, creditors, and all parties in interest." Sale Order at 3.

### 5. Plan Confirmation and Creation of the AIPC Liquidation Trust

The Debtors' plan of reorganization was confirmed on August 17, 2006 (the "Confirmed Plan" or "Plan"). [Docket No. 557]. The Confirmed Plan provided for the creation of the Liquidation Trust

as a representative of the estate. The role of the Trust was to liquidate the AIPC's assets (including causes action held by the estate) for the benefit of creditors. Confirmed Plan at 19-20. Jason Searcy was appointed as the initial Liquidating Trustee (or "Trustee"). Searcy subsequently withdrew as Trustee and Robbye Waldron was appointed Trustee. The confirmed plan further provided that the proceeds from the sale of AIPK's remaining stake in CGC would be used to "fund the Plan and the Liquidation Trust." Confirmed Plan at 11.

### 6. The Trustee Commences the Present Adversary Proceeding

The Trustee, AIPC, and AIPK filed the present adversary proceeding on October 6, 2006. The Complaint asserts twenty-five claims, including fraud, fraudulent inducement, breach of fiduciary duty, fraudulent and preferential transfers under the Bankruptcy Code and state law, promissory estoppel, negligence and gross negligence, conversion, and conspiracy. The Complaint names as defendants Bridge, Petrocaspian, LLC, CGC, Lemington Investments, Baring Vostock Capital Limited Partners, Bank Turanalem, and seven former officers and directors of AIPC. Plaintiffs' claims center on the pre-bankruptcy sale of 85% of AIPK's stake in CGC and License 1551. Specifically, Plaintiffs allege that AIPC obtained inadequate consideration for this 85% stake, and that the officer and director defendants breached their duties by approving the sale. The

-8-

Complaint also alleges that the pre-bankruptcy sale of CGC stock is avoidable as a preference or fraudulent transfer under 11 U.S.C. §§ 548,547, and 549, and under state law.

Six of the officer and director defendants, Bridge, Petrocaspian, and CGC filed motions to dismiss certain claims under Rule 12(b)(6) and for a more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure. These motions attack Plaintiffs' fraud allegations as insufficient under Rule 9(b). Bridge and Knight also attack Plaintiffs' standing to assert fraudulent and preferential transfer claims under the Bankruptcy Code.

## DISCUSSION

### A.    <u>STANDARDS GOVERNING THE RULE 12(B)(6) AND 12(E) MOTIONS</u>.

The Motions challenge the sufficiency of the Complaint under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure and seek dismissal under Rule 12(b)(6) or, in the alternative, for a more definite statement under Rule 12(e). The standard for dismissal under Rule 12(b)(6) is stringent. Rule 8(a) requires only "a short and plain statement of the claims showing that the pleader is entitled to relief." A claim is sufficiently pled under the notice pleading standard of Rule 8(a) if the allegations in the complaint "give the defendant fair notice of what the claim is and the grounds

–9–

upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed. 2nd 80 (1957). Given this "notice pleading" standard, courts in this circuit and elsewhere have traditionally viewed Rule 12(b)(6) motions with disfavor. <u>See</u> <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498 (5th Cir. 2000) (a motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted."). Likewise, for the same reason, courts have viewed Rule 12(e) motions for a more definite statement with disfavor, and generally deny these motions on the ground that discovery is the more appropriate vehicle for obtaining additional information about the plaintiff's claims. <u>See</u>, <u>e.g.</u>, <u>Mitchell v. E.Z. Way Towers, Inc.</u>, 269 F.2d 126, 132 (5th Cir. 1959); 5A C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 1377 (2nd ed. 1990). However, as the Supreme Court has recently cautioned, a plaintiff must plead more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. <u>Bell Atlantic Corp. v. Twombly</u>, __ U.S. __, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Although the complaint need not include detailed factual allegations under Rule 8(a), the complaint must include sufficient factual allegations (taken as true) to raise "a right to relief above the speculative level." <u>Id</u>.

Rule 9(b) of the Federal Rules of Civil Procedure imposes additional requirements for pleading claims of fraud. Rule 9(b) requires the plaintiff to plead the circumstances constituting fraud

-10-

with particularity.  <u>See</u> Fed R. Civ. P. 9(b); <u>Tuchman v. DSC</u> <u>Communications Corp</u>., 14 F.3d 1061, 1068 (5th Cir. 1994).  In order to satisfy this standard, the plaintiff must allege the identity of the person making a fraudulent statement, the time, place and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated.  <u>Tuchman</u>, 14 F.3d at 1061.  Rule 9(b) does not require a plaintiff to plead all of its evidence, but requires sufficient factual allegations to lend some measure of substantiation to a claim that the defendant committed fraud.  <u>Id</u>.  Rule 9(b) applies not only to fraud claims, but also to "non-fraud" claims that are based upon allegations of fraud.  For example, a breach of fiduciary duty claim is not generally subject to Rule 9(b).  However, if a breach of fiduciary duty claim is grounded in whole or in part on allegations of fraud, the fraud allegations must be pled in conformity with Rule 9(b).

**B.    <u>SUFFICIENCY OF PLAINTIFFS' FRAUD ALLEGATIONS</u>.**

Each of the moving defendants challenge the sufficiency of Plaintiffs' fraud allegations as well as the allegations in the Complaint that refer to Defendants collectively as "Director/Officer Defendants" or "Defendants."  Plaintiffs have asserted claims for fraudulent transfer (Count 1), "transfers to hinder, delay, or defraud" (Count 3), fraud (Count 6), fraud in the inducement (Count 11), and fraudulent concealment (Count 20).  Given that fraud is an

-11-

element of these claims, Rule 9(b) applies to the fraud allegations supporting these claims.[1]  Plaintiffs have also asserted claims which do not include fraud as an essential element, but which appear to be based in whole or in part upon the same allegations of fraud that support Plaintiffs' fraud-based claims.  Plaintiffs' claims for breach of trust duty (Count 7), breach of fiduciary duty (Count 8), breach of duties of trustee (Count 10), promissory estoppel (Count 12), waste (Count 13), conversion (Count 16), conspiracy (Count 22), unjust enrichment (Count 23), and exemplary damages (Count 24) appear to based, at least in part, upon the same allegations of fraud supporting their fraud-based claims.  If a complaint includes allegations of fraud to support a claim that does not include fraud

---

[1]The applicability of Rule 9(b) to fraudulent transfer claims turns on the nature of claim.  Most courts have held that fraudulent transfer claims based upon constructive fraud under 11 U.S.C. §548(a)(1)(B) are not subject to Rule 9(b).  <u>See</u>, <u>e.g.</u>, <u>In re Actrade Financial Technologies, Ltd.</u>, 337 B.R. 791, 801 (S.D. N.Y. 2005); <u>China Resource Prods. (USA) Ltd. v. Fayda Int'l, Inc.</u>, 788 F.Supp. 815, 819 (D. Del. 1992).  On the other hand, Rule 9(b) applies to fraudulent transfer claims based upon allegations of actual fraud under §548(a)(1)(A).  <u>See</u>, <u>e.g.</u>, <u>Actrade Financial</u>, 337 B.R. at 801; <u>Quilling v. Stark</u>, No. 3:05-CV-1976-L, 2006 WL 1683442 at *5 (N.D. Tex. May 22, 2006).  Count 1 of the Complaint asserts a claim for fraudulent transfer under section 548, but does not specify whether the claim is based upon actual or constructive fraud:  "Director/Officer Defendants, BHL, CGC, BUCP, Bank Turanalem and Lemington received fraudulent transfers of AIPC's assets either with actual intent to hinder, delay or defraud....; or without paying reasonably equivalent value in exchange for the transfer."  Complaint at ¶ 55.  To the extent that Count 1 is based upon actual fraud, it must comply with Rule 9(b).

as an essential element, Rule 9(b) applies solely to the averments of fraud.  <u>Lone Star Ladies Inc. Club v. Schlotzsky's Inc.</u>, 238 F.3d 363, 368-369 (5th Cir. 2001).  Rule 8(a) applies to the remaining allegations supporting the claim.  Accordingly, Rule 9(b) applies to the fraud-based allegations supporting counts 7, 8, 10, 12, 13, 16, and 22-24 of the Complaint.

The allegations in the Complaint that refer to Defendants collectively do not satisfy the heightened pleading standards of Rule 9(b), nor do they provide adequate notice under the more liberal pleading standard of Rule 8(a).[2]  When a claim is asserted against multiple defendants, Rule 9(b) requires specific, separate allegations detailing the allegedly fraudulent conduct of each defendant.  <u>See</u>, <u>e.g.</u>, <u>Haskin v. R.J. Reynolds Tobacco Co.</u>, 995 F. Supp. 1437, 1440 (M.D. Fla. 1998); <u>Sears v. Likens</u>, 912 F.2d 889, 893 (7th Cir. 1990) (complaint cannot group defendants together without specifying which defendant was involved in which fraudulent activity). In other words, a complaint cannot, consistent with Rule

---

[2]The court's ruling in its October 1st Amended Order was limited the to the allegations asserted against Debtor's former officers and directors.  After further consideration, the court concludes that this pleading defect also exists with respect to the collective references to **all** of the defendants, not just to the references to the officer and director defendants. Accordingly, the court's amended order issued contemporaneously with these Reasons for Decision will reflect the court's modified ruling in this regard.

9(b), group all defendants into "one wrongdoing monolith." <u>First</u>
<u>American Bank and Trust by Levitt v. Frogel</u>, 726 F.Supp. 1292, 1295
(S.D. Fla. 1989). At a minimum, the complaint must plead sufficient
facts to show each defendant's allegedly fraudulent conduct, or each
defendant's role in a scheme to commit fraud.

The Complaint in the present case groups former members of
AIPC's board of directors together with former members of the
Debtor's management team, an outside investment firm, a Kazakh
financial institution, and other unaffiliated corporate entities
without any effort to describe each defendant's role in the
fraudulent conduct alleged by Plaintiffs. This defect is even more
apparent with respect to the director defendants. According to
Faris' Motion, Defendants George Faris, William Smart, Donald Rynne
and John Kelly resigned from AIPC's board of directors before the
fraudulent conduct outlined in the Complaint occurred. During oral
argument, Plaintiffs' counsel argued that these director defendants
could not avoid liability based upon the fact that they resigned
prior to the consummation of the events underlying Plaintiffs' fraud
claims (a so-called "Geronimo" defense).[3] However, even if these

---

[3]The "Geronimo" defense was rejected by the Fifth Circuit in
<u>Xerox v. Genmoora Corp.</u>, 888 F.2d 345, 355 n.60 (5th Cir. 1989).
According to the court:

> Xerox has colorfully described the theory advanced by
> the ex-directors as the "Geronimo theory." Under this

-14-

director defendants are foreclosed from asserting a "Geronimo" defense, the Complaint still omits the essential facts necessary to connect these defendants to the fraudulent conduct alleged by Plaintiffs. In sum, the collective references to Defendants as a group in the Complaint do not satisfy Rule 9(b)'s heightened pleading standard for fraud claims.

This collective mode of pleading fraud also does not satisfy basic notice pleading standards under Rule 8(a). As the Supreme Court recently observed in <u>Bell Atlantic Corp. v. Twombly</u>, __ U.S. __, 127 S.Ct. 1955, 167 L. Ed. 929 (2007), Rule 8(a)'s liberal notice pleading standard is not without teeth. The ultimate question that must be answered under Rule 8(a) is whether a pleading provides the defendant with "fair notice of what the plaintiff's claim is **and the grounds upon which it rests.**" <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 514-515, 122 S.Ct. 992, 152 L.Ed. 2d 1 (2002). Accordingly, a complaint cannot rest on mere conclusions, but must plead sufficient "factual matters" and "possess enough heft" to show that the pleader is entitled to relief. <u>Bell Atlantic</u>

---

theory, if a commercial airline pilot were to negligently aim his airplane full of passengers at a mountain, and then bail out before impact, he would not be liable because he was not at the controls when the crash occurred. Certainly the position argued by the ex-directors would allow many corporate fiduciaries who are guilty of wrongdoing to avoid liability merely by appropriately timing their resignations.

-15-

Corp., 127 S. Ct. at 1965-67. In the present case, the Complaint does not identify each defendant's role in any fraudulent conduct, especially in light of the fact that four of the director defendants resigned prior to key events that form the nucleus of Plaintiffs' fraud claims. Accordingly, the Complaint does not provide Defendants with fair notice of the grounds of the claims asserted against them.

Finally, the court agrees that the allegations of fraud in the Complaint do not satisfy Rule 9(b) because they do not include specific facts establishing the circumstances of any fraudulent conduct. Specifically, Rule 9(b) requires that Plaintiffs identify the content of the specific statements alleged to be fraudulent (or in the case of fraudulent concealment, the specific information that was concealed), "the person or persons making the fraudulent statement, and the time, place, and manner of communication of the misrepresentation." See Tuchman v. DSC Communications Corp., 14 F3d 1061, 1068 (5th Cir. 1994). The fraud allegations in the Complaint do not satisfy these requirements. The Complaint does not identify the contents of any representations that Plaintiffs allege to be fraudulent, nor does the Complaint detail "the time, place and manner of communication of the misrepresentation" or the Defendants responsible for making a misrepresentation.

Turning to the specific relief requested in the Motions, the

-16-

court concludes that the pleading defects outlined above are curable, and that dismissal under Rule 12(b)(6) is not appropriate at this stage. Accordingly, the court grants Defendants' request for a more definite statement under Rule 12(e) in the following respects:

> (1) The allegations supporting counts 1, 3, 6, 7, 8, 10, 11-13, 16, 20, and 22-24 must be amended to allege the fraudulent conduct attributable to each individual defendant; and

> (2) The allegations of fraud supporting counts 1, 3, 6, 11, 12, 20, and 22-24 must be amended to plead facts showing the circumstances constituting fraud.

To the extent that the Motions request dismissal under 12(b)(6), the motions are denied without prejudice. Bridge and Knight also challenge the sufficiency of Plaintiffs' conversion claim. In light of the Court's ruling on the sufficiency of Plaintiffs' fraud allegations and the fact that Plaintiffs' conversion claim appears to be based in part on the same allegations of fraud underlying their fraud claims, the Court denies the Motions without prejudice with respect to the conversion claim to allow Plaintiffs to re-plead their fraud allegations.

### C. **PLAINTIFFS' FRAUDULENT TRANSFER AND PREFERENCE CLAIMS.**

Bridge's and Knight's motions also challenge the fraudulent transfer and preference claims asserted in counts 1 through 5 of the Complaint. Counts 1 through 5 challenge the pre-petition sale of

-17-

85% of AIPK's stock in CGC to Bridge under state law and under 11 U.S.C. §§547-549 as a fraudulent or preferential transfer.  Bridge and Knight contend that AIPC and the Trustee cannot, as a matter of law, challenge the pre-petition sale of CGC stock under sections 547-549 because CGC was not directly owned by AIPC, but was instead held by AIPK, a non-filing, wholly-owned subsidiary of AIPC. According to Bridge and Knight, the stock of CGC is not part of AIPC's bankruptcy estate, and AIPC did not have an "interest in property" with respect to CGC.  Plaintiffs counter by pointing to allegations in the Complaint that AIPK held the stock of CGC as AIPC's "agent, trustee, and/or nominee" and that, as a result, "AIPC had an equitable interest in the property held by its agent, AIPK." Complaint at ¶¶ 42, 44.  Plaintiffs also point to allegations in the Complaint that AIPK was the alter ego of AIPC.  <u>Id</u>.  As always, the starting point for the court is the text of the relevant provisions of the Bankruptcy Code.

### 1. Fraudulent and Preferential Transfer Claims under 11 U.S.C. §§547-549

Section 547(b) of the Bankruptcy Code sets forth the elements of an avoidable preference claim:

> [T]he trustee may avoid any transfer **of an interest of the debtor in property**--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

-18-

        (3) made while the debtor was insolvent;
        (4) made--
            (A) on or within 90 days before the date of the filing of
                the petition; or
            (B) between ninety days and one year before the date of
                the filing of the petition, if such creditor at the
                time of such transfer was an insider; and
        (5) that enables such creditor to receive more than such
        creditor would receive if--
            (A) the case were a case under chapter 7 of this title;
            (B) the transfer had not been made; and
            (C) such creditor received payment of such debt to the
                extent provided by the provisions of this title.

(emphasis added).  Section 548(a)(1) of the Bankruptcy Code governs

fraudulent transfer claims:

        The trustee may avoid any transfer ... **of an interest of
        the debtor in property**, ... that was made or incurred on
        or within 2 years before the date of the filing of the
        petition, if the debtor voluntarily or involuntarily--
        (A) made such transfer or incurred such obligation with
        actual intent to hinder, delay, or defraud any entity to
        which the debtor was or became, on or after the date that
        such transfer was made or such obligation was incurred,
        indebted; or
        (B)(I) received less than a reasonably equivalent value
        in exchange for such transfer or obligation; and
        (ii)(I) was insolvent on the date that such transfer was
            made or such obligation was incurred, or became
            insolvent as a result of such transfer or
            obligation;
        (II) was engaged in business or a transaction, or was
            about to engage in business or a transaction, for
            which any property remaining with the debtor was an
            unreasonably small capital;
        (III) intended to incur, or believed that the debtor
            would incur, debts that would be beyond the debtor's
            ability to pay as such debts matured; or
        (IV) made such transfer to or for the benefit of an
            insider, or incurred such obligation to or for the
            benefit of an insider, under an employment contract
            and not in the ordinary course of business.

(emphasis added).  Finally, section 549 governs the avoidance of

post-petition transfers:

> Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer **of property of the estate**--
> (1) that occurs after the commencement of the case; and
> (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> (B) that is not authorized under this title or by the court.

Both the Trustee and AIPC have standing to avoid transfers under these provisions. Although the Code explicitly confers avoidance powers to a "trustee," courts have construed the term "trustee" to include a debtor in possession acting in the capacity of the trustee pursuant to section 1107 of the Code. See, e.g., Yellowhouse Mach. Co. v. Mack (In re Hughes), 704 F.2d 820 (5th Cir. 1983) (Chapter 11 debtor in possession could avoid transfer even though the transfer may have resulted from the debtor's misconduct).[4]

Bridge's and Knight's argument, however, focuses on the requirement that a transfer challenged under these provisions must be a transfer "of an interest **of the debtor** in property." 11 U.S.C. §§547(b), 548(a)(1), 549. Although the Code does not define the term "interest of the debtor in property," courts generally start

---

[4]With court approval, a special committee or even an individual creditor may be allowed to pursue an avoidance action. See, e.g., Commodore Int'l Ltd. v. Gould (In re Commodore Int'l), 262 F.3d 96, 99-110 (2d Cir. 2001); Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 13 n.5, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000).

-20-

with the definition of property of the estate in 11 U.S.C. §541. The Supreme Court has interpreted the term "interest of the debtor in property" to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." Begier v. IRS, 496 U.S. 53, 58 (1990). Put another way, an interest in property is "of the debtor for purposes of Section 547(b) if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors." In re Bullion Reserve of North America, 836 F.2d 1214, 1217 (9th Cir.), cert. denied, 486 U.S. 1056 (1988). The property of the estate, in turn, consists of whatever "legal and equitable interests" of the debtor "wherever located or by whomever held" at the time that the bankruptcy petition is filed. 11 U.S.C. §541; Schimmelpenninck v. Byrne (In re Schimmelpenninck), 183 F.3d 347 (5th Cir. 1999). Non-bankruptcy law governs whether a debtor has an interest in property. Accordingly, the first step in determining whether the debtor has an interest in property is to look to state law, or federal substantive law if the underlying interest is grounded upon federal law. Butner v. United States, 440 U.S. 48, 54 (1977); In re Supreme Beef Processors, Inc., 468 F.3d 248, 255 (5th Cir. 2006). Once property rights are determined under non-bankruptcy law, federal bankruptcy law establishes the extent to which the property interest is property of the bankruptcy estate

-21-

under section 541 of the Bankruptcy Code. <u>Butner</u>, 440 U.S. at 54.

**2. Did the Debtor Have an Interest in the CGC Stock Transferred to Bridge?**

Bridge and Knight contend that the Trustee and AIPC cannot challenge the pre-petition transfer of CGC stock because that stock was not "an interest of the debtor in property." At the time of the transfer, AIPC owned 100% of AIPK, which, in turn, owned 100% of CGC. The property of a debtor's estate generally does not include the property of the debtor's non-filing subsidiaries. The debtor's estate includes the debtor's equity interest in its subsidiary, but not the subsidiary's assets. This distinction flows from the basic principle under state corporate law that a corporation is a separate legal entity from its shareholders. Simply put, a "parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's." <u>Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)</u>, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1988).

However, AIPK's ownership of CGC does not end the inquiry. Federal bankruptcy law and state corporate law provide grounds for disregarding the separate corporate existence of a parent and its subsidiary under certain circumstances. For example, substantive consolidation is a federal bankruptcy remedy through which the assets and liabilities of different legal entities may be

-22-

consolidated and treated as the assets and liabilities of a single estate for purposes of the bankruptcy case. See, e.g., In re Ark-La-Tex Timber Co., Inc., 482 F.3d 319, 327 (5th Cir. 2007); In re Owens Corning, 419 F.3d 195, 205 (3rd Cir. 2005) ("Substantive consolidation, a construct of federal common law, emanates from equity.") Plaintiffs did not move for substantive consolidation of AIPC and AIPK in the bankruptcy case prior to plan confirmation, nor do they request consolidation in this proceeding. Substantive consolidation does not, however, supplant analogous state law remedies that allow courts to pierce the corporate veil, such as the alter ego doctrine. See, e.g., Owens Corning, 419 F.3d at 205 ("Prior to substantive consolidation, other remedies for corporate disregard were (and remain) in place. For example, where a subsidiary is so dominated by its corporate parent as to be the parent's 'alter ego,' the 'corporate veil' of the subsidiary can be ignored ... under state law.").[5]

In the present case, the Trustee and AIPC allege that AIPK was

_____

[5]The alter ego doctrine and substantive consolidation overlap to the extent that the standards and factors formulated by courts applying the two doctrines are the same. For example, in In re Auto-Train Corp., the court required "substantial identity of the entities consolidated, and, in addition, that consolidation is necessary to avoid some harm or realize some benefit." 810 F.2d 270, 276 (D.C. Cir. 1987). As explained below, this standard is almost identical to the core elements of an alter ego or veil-piercing claim under state law.

-23-

an alter ego of AIPC at the time of the pre-petition transfer of CGC
and, as a result, AIPC had an interest in AIPK's property (including
CGC) at the time of the transfer.  The Trustee and AIPC also allege
that AIPC retained an ownership interest in CGC and License 1551
because AIPK held these assets solely as a "trustee, nominee, or
agent" of AIPC.  Although these nominee/agency allegations are
framed as an alternative basis for standing, they appear to be
grounded in essentially the same allegations supporting Plaintiffs'
alter ego claims.  The Complaint does not plead sufficient facts to
establish standing based upon a "nominee/agency" theory apart from
the alter ego doctrine.  Accordingly, the question for the court is
whether Plaintiffs' alter ego allegations can support a fraudulent
transfer claim based upon the transfer of AIPK's property.

### 3.  Plaintiffs' Alter Ego Allegations.

The gravamen of Knight's and Bridge's answer to this question
is that an alter ego finding does not support a fraudulent transfer
claim because an alter ego relationship does not result in the
consolidation of AIPC's and AIPK's property, nor does it provide
AIPC with any legal or equitable interest in AIPK's property.  As
explained above, the court's inquiry must focus on applicable state
law.  Butner, 440 U.S. at 54; S.I. Acquisition, Inc. v. Eastway
Delivery Services, Inc. (In re S.I. Acquisition, Inc.), 817 F.2d
1142, 1152 (5th Cir. 1987) (examines state law to determine scope of

-24-

alter ego doctrine in a bankruptcy proceeding).

   *i. Choice of Law*

The threshold question for the court is which state's law applies. While the parties have not briefed choice of law, the Trustee cites Nevada law. In <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, the Supreme Court held that a court must apply the choice-of-law rules of the forum in which it sits for state law claims when the court's jurisdiction is grounded on diversity of citizenship. 313 U.S. 487 (1941). Unlike <u>Klaxon</u>, the present matter is grounded on bankruptcy jurisdiction and involves an element of a fraudulent transfer claim under the Bankruptcy Code. On the other hand, the alter ego doctrine is a state law remedy, and is invoked here to establish whether AIPC had an interest in property under state law. Although the court is not bound by <u>Klaxon</u> in the present case, bankruptcy courts typically apply the choice-of-law rules of the forum state in cases involving state law claims that do not implicate federal policy. <u>Woods-Tucker Leasing Corp of Ga. v. Hutchesen-Ingram Dev. Co.</u>, 642 F.2d 744, 748 (5th Cir. 1981); <u>ASARCO LLC v. Americas Mining Corp.</u>, 382 B.R. 49 (S.D. Tex. 2007).

Louisiana courts have not explicitly ruled on the appropriate choice of law for alter ego claims. Nevertheless, the Fifth Circuit has predicted that Louisiana courts would look to the law of the state of incorporation. <u>Lone Star Industries, Inc. v. Redwire</u>, 757

-25-

F.2d 1544, 1548 n.3 (5th Cir. 1985) (citing <u>Quickick, Inc. v</u> <u>Quickick Int'l</u>, 304 So.2d 402, 406-07 (La. App.), <u>writ</u> <u>denied</u>, 304 So.2d 123 (1974)). This choice-of-law rule is consistent with the Restatement as well as the choice-of-law rules of other jurisdictions. <u>See</u> <u>Restatement (second) of Conflicts of Law</u> §307 (1971); <u>Maltz v. Union Carbide Chemicals & Plastics Co.</u>, 992, F.Supp. 286, 300 (S.D. N.Y. 1998) (applying law of the state of incorporation). In the present case, the court will look to Nevada alter ego law because both AIPC and AIPK are Nevada corporations.

  *ii.* *Nevada Alter Ego Law*

Nevada courts recognize traditional veil-piercing doctrines, including the alter ego doctrine. <u>See</u> <u>LFC Marketing Group, Inc. v.</u> <u>Loomis</u>, 8 P.3d 841, 845 (Nev. 2000); <u>Ecklund v. Nevada Wholesale</u> <u>Lumber Co.</u>, 562, P.2d 479, 480 (Nev. 1977). Under the traditional application of the alter ego doctrine, the court disregards the corporation's separate existence ("pierces the corporate veil") to hold the corporation's shareholders liable for the corporation's debts. The present case, however, involves so-called "reverse veil-piercing" through which a court pierces the corporate veil to hold a wholly-owned subsidiary liable for its parent company's debts. <u>See</u> <u>generally</u> S. Roberts, "Alter Ego Claims in Bankruptcy," <u>Norton</u> <u>Annual Survey of Bankruptcy Law Part I</u> §18 (September 2006). Nevada courts have recognized reverse veil-piercing based upon the alter

ego doctrine. <u>LFC Marketing</u>, 8 P.3d at 904-05 (concluding that "reverse piercing is appropriate in those limited instances where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted.") Nevada courts and the Fifth Circuit have also applied Nevada alter ego law in bankruptcy cases. <u>See</u>, <u>e.g.</u>, <u>In re National Audit Defense Network</u>, 367 B.R. 207, 228-30 (Bankr. D. Nev. 2007) (trustee established grounds under Nevada alter ego law to pierce corporate veil of affiliated entities and acknowledging the validity of reverse veil piercing); <u>In re Giampietro</u>, 317 b.R. 841, 850 (Bankr. D. Nev. 2004); <u>see also</u> <u>S. I. Acquisition</u>, 817 F.2d 1142, 1152-53 (5th Cir. 1987) (discussing Texas and Nevada alter ego law).

> *iii. Do the Trustee's and AIPC's Alter Ego Allegations*
> *Provide a Basis for Their Section 547-549 Claims?*

Bridge and Knight do not challenge the viability of the alter ego doctrine under Nevada law. Instead, they contend that the alter ego doctrine does not, as a matter of law, provide a basis for the trustee to challenge a pre-petition transaction between AIPK and Bridge. According to Bridge and Knight, while the alter ego doctrine may be used as a remedy to shift liability among affiliated entities, it does not "have the effect of merging AIPK and the debtor so that AIPK's assets become the debtor's property." Bridge's Motion at 14. In other words, the doctrine cannot

-27-

"establish that a transfer of a non-debtor's property that occurred 9 months prior to the bankruptcy filing was a transfer of property of the debtor." Bridge Brief at 14 n.7. Bridge and Knight are correct that the alter ego doctrine provides a remedy for shifting liability among affiliated entities. For example, the alter ego doctrine may allow a tort claimant to reach the assets of a tortfeasor's stockholder to satisfy his claims. The flaw in Bridge's and Knight's argument is that Nevada's alter ego doctrine does not merely shift liability from one entity to another, but expands the debtor's estate to include the property of its alter ego.

Like other jurisdictions, Nevada recognizes that a parent company and its subsidiary are not liable for the other's debts and do not have any claim or right to each other's assets absent grounds to pierce the corporate veil. LFC Marketing Group, Inc., 8 P.3d at 902-903 (Nevada generally treats corporations as "separate legal entities"). An alter ego finding under Nevada law transforms this relationship by deeming a corporation and its alter ego to be a single entity. See, e.g., McCleary Cattle, 317 P.2d at 282 ("For the purposes of execution, the [corporation] and [its alter ego] are to be regarded as identical.").[6] As a result, a "corporation has,

---

[6] The McCleary case was overruled in part on different grounds in Callie v. Bowling, 160 P.3d 878 (Nev. Jun 28, 2007).

-28-

in some sense, an equitable interest in the assets of its alter ego." <u>In re Western World Funding, Inc.</u>, 52 B.R. 743, 783 (Bankr. Nev. 1985) (applying Nevada law). Applying Nevada law, the <u>Western World</u> court concluded that a bankruptcy trustee had standing to bring an alter ego action against former officers and directors of the debtor based, in part, on 11 U.S.C. § 541 and 704(1) and the trustee's duty "to collect and reduce to money the property of the estate." According to the court:

> The estate also includes all legal and equitable interests of the debtor. **As discussed above, a Nevada corporation has an equitable interest in the assets of the alter ego.** Therefore, the trustee does not bring this as a chose in action on which the debtor-corporation could have sued outside of bankruptcy; he brings it simply to establish the identity of the alter egos with the corporation in order to determine what are the assets of the estate.

52 B.R. at 783 (emphasis added). The <u>Western World</u> court also expressly rejected the argument made by Bridge and Knight in the present case that an alter ego finding merely shifts liability from one entity to another and does not bring the assets of the alter ego into the debtor's estate:

> Some courts have held that the trustee may not enforce alter ego liability for the benefit of creditors of a debtor corporation, on the

---

In <u>Callie</u>, the court concluded that the alter ego doctrine could not, consistent with due process, be used to add a third party to a judgment without notice and an opportunity to be heard.

06-02018 - #187  File 05/19/08  Enter 05/19/08 14:22:01  Main Document  Pg 29 of 47

> grounds that the alter ego doctrine does not
> create assets for the estate, but merely shifts
> liability for corporate debts to a third party.
> *See e.g. Garvin v. Matthews*, 193 Wash. 152, 74
> P.2d 990, 992 (1938).  However, this approach
> is inconsistent with the "identity" theory of
> Nevada alter ego law.  In this state, the alter
> ego is not considered to be a "third party" to
> whom liability is shifted.

Nevada's alter ego doctrine supports the Trustee's and AIPC's standing argument in the present case because Nevada law recognizes that a debtor has an interest in the assets of its alter ego.  If AIPC's sole "interest in property" was the stock of AIPK, AIPC would not have standing to challenge AIPK's sale of CGC.  However, if AIPC and the Trustee can establish that AIPK was an alter ego of AIPC at the time of the transfer, then AIPC had an equitable interest in the property of AIPK (including the shares of CGC stock transferred to Bridge) under Nevada law at the time of the alleged fraudulent transfer.  Such a finding would expand the bankruptcy estate because AIPC and AIPK are deemed "to be identical and inseparable from each other" under Nevada law.  <u>Western World Funding</u>, 52 B.R. at 780 (citing <u>McCleary Cattle</u>, 317 P.2d 957).  AIPC's equitable interest in AIPK's assets would be an "interest of the debtor in property," and thus subject to an avoidance action under sections 547-549. Viewed another way, since a finding of an alter ego relationship under Nevada law would expand the bankruptcy estate to include the property of AIPK, the CGC stock transferred by AIPK pre-petition

"would have been part of the estate had it not been transferred before the commencement of the  bankruptcy proceeding" and is thus recoverable by the Trustee and AIPC if the other elements of sections 547-549 are satisfied.  <u>Beiger</u>, 496 U.S. at 58; <u>Western World Funding</u>, 52 B.R. at 784;  <u>See</u> <u>also</u> <u>Freehiling v. Nielson</u>, (<u>In re F8C Services, Inc.</u>), 44 B.R. 863 (Bankr. S.D. Fla. 1984) (assets of debtor-corporation's alter ego are assets of the estate).

This result is consistent with a recent decision in the ASARCO bankruptcy case. In <u>ASARCO LLC v. Americas Mining Corporation</u>, 382 B.R. 49, 68 (S.D. Tex. 2007), the district court applied Delaware law in holding that the debtor had standing to challenge a transfer of assets held by its wholly-owned subsidiary.  In that case, ASARCO's wholly-owned subsidiary, SPH, owned 54.2% of a third entity, SPCC.  ASARCO alleged that SPCC was transferred to the debtor's immediate parent, AMC, as part of a scheme to "remove ASARCO's most valuable asset from the reach of ASARCO's creditors." <u>Id</u>. at 58.  AMC moved to dismiss under Rule 12(b)(6) on the grounds that ASARCO did not have standing to challenge the transfer under section 548 because SPCC was the property of SPH, not ASARCO.  In response, ASARCO alleged that SPH was ASARCO's alter ego. The court denied the motion to dismiss based upon these alter ego allegations. According to court, if SPH was ASARCO's alter ego, then, under Delaware law, SPH's holding of SPCC stock was "an interest of ASARCO

in property under state law," and ASARCO could challenge the transfer under section 548. Id. at 66. Although the ASARCO court's holding was not based upon Nevada law, the court's reasoning in this regard is consistent with Nevada law.

iv.  *Review of The Cases Cited By Bridge and Knight*

Bridge and Knight cite a number of cases to support their position that the alter ego doctrine provides no basis to challenge the pre-petition sale of CGC. The case most directly on point is Lippe v. Bairnco Corp., 230 B.R. 906 (S.D.N.Y. 1999). In Lippe, the district court originally ruled that the trustees of a creditors' trust had standing to challenge the transfer of assets owned by the debtor's subsidiary based upon allegations that the subsidiary was the debtor's alter ego. The court subsequently reversed its prior ruling and granted a motion to dismiss the trustee's fraudulent transfer claims on the ground that an alter ego finding merely shifts liability from the debtor to its subsidiary and allows the debtor's creditors to look to the subsidiary's assets "in general" to satisfy their claims, but would "not give plaintiffs the right to attack a particular transaction as a fraudulent conveyance." 230 B.R. at 914-15.

The Lippe case is distinguishable from the present case because the Lippe court based its analysis on New York law, and applied a version of the alter ego doctrine that is inconsistent with Nevada's

-32-

alter ego doctrine.  As explained above, Nevada courts have expressly rejected the view that an alter ego finding merely shifts liability for corporate debts to third parties, but does not bring the assets of the alter ego into the debtor's estate or create any interests of the debtor in the property of its alter ego. <u>See</u> <u>Western World Funding</u>,52 B.R. at 783.  Moreover, the <u>Lippe</u> court cites no authority for its distinction between the right of a debtor's creditors to recover from an alter ego's assets "in general" and the right of a trustee to challenge transfers of "specific" assets of the alter ego.  This distinction is not grounded in the Bankruptcy Code, nor does the distinction appear in Nevada case law defining and applying the alter ego doctrine. Sections 547-549 of the Code refer solely to an "interest of the debtor in property."  If the debtor has a legal or equitable interest in the property of an alter ego under state law (as under Nevada law) the debtor has standing to challenge that transfer under the Bankruptcy Code.  The <u>Lippe</u> court's distinction leads to the anomalous result that the assets of an alter ego "in general" may be available to a debtor's creditors, yet a trustee could not challenge pre-petition transfers of specific assets of an alter ego that diminish the pool of assets that would have otherwise been available to pay creditors.  In sum, the court finds the reasoning of the <u>ASARCO</u> court more persuasive than <u>Lippe</u> in light of Nevada

-33-

law.[7]

Bridge and Knight also cite the lower court decisions and unpublished opinion of the Fifth Circuit in Southmark Corp. v. Crescent Heights VI, et al., 1996 WL 459958 (5th Cir. July 26, 1996). In that case, the Fifth Circuit affirmed the bankruptcy court's order granting summary judgment and dismissing avoidance claims brought by the debtor. Southmark sought to avoid a transfer of assets by its subsidiary based upon allegations that the subsidiary was its alter ego. The Fifth Circuit affirmed the

---

[7] The anomalous result in Lippe may reflect the related, but slightly different issue of a trustee's standing to assert an alter ego action (as opposed to an avoidance action) on behalf of the estate. Under New York law, an alter ego action can only be asserted by creditors harmed by the debtor or the alter ego. Neither a trustee nor a debtor has standing to assert alter ego claims, and alter ego claims are not an asset of the estate. The case law is not clear on the interplay between standing to assert an alter ego claim and standing to avoid a transfer of the assets of an alter ego. However, if, as under New York law, a trustee lacks standing to bring an alter ego action, it is reasonable to conclude that a trustee cannot assert an alter ego claim as a basis for avoiding a transfer under section 547-549. This rationale is not explicit in the Lippe decision, but may explain the outcome of that case as well as the outcome in other cases cited by Bridge and Knight that apply state alter ego doctrines that are similar to New York's version of the doctrine. See, e.g., In re Transcolor Corp., 296 B.R. 343 (Bankr. D. Md. 2003) (applying Maryland law). In any event, Nevada law differs from New York law in this regard. Under Nevada law a debtor or a trustee has standing to assert an alter ego claim. See, e.g., National Audit Defense Network, 367 B.R. at 228-29. The Fifth Circuit has also recognized a trustee's standing to assert alter ego claims under Nevada and Texas law. S. I. Acquisition, 817 F.2d 1142, 1152-53 (5th Cir. 1987) (discussing Texas and Nevada alter ego law).

-34-

bankruptcy court on the grounds that Southmark "was the very party that abused [the corporate form] in the first place" and that allowing Southmark to rely on the doctrine "would seem to disserve [the doctrine's] purpose." 1996 WL at *6. The court emphasized that its holding was limited to the specific facts of that case, and that the court's holding did not mean that "a shareholder could never use the reverse piercing doctrine under any circumstances." Id. at *7.

The Southmark case is distinguishable on several grounds. First, the court applied Texas law and based its holding on the lack of Texas case law allowing use of the alter ego doctrine by a parent company to pierce the veil of its subsidiary. In contrast, Nevada law expressly allows reverse piercing. Even more importantly, the Southmark case was decided on a motion for summary judgement, and included consideration of whether equity supported application of the alter ego doctrine in light of the specific undisputed facts of that case. Evidence that the party seeking to pierce the corporate veil participated in the misuse of the corporate form is a factor that a court should consider in deciding whether to grant relief. This determination may be appropriate at the summary judgment stage if the material facts are not in dispute. However, weighing the factors that go into a determination of equity is usually inappropriate at the pleading stage when the pertinent facts have

-35-

yet to be developed through discovery.  Accordingly, a determination made in <u>Southmark</u> in the context of a summary judgment motion does not support dismissal in the present case based upon the allegations of the Complaint.[8]

Finally, Bridge and Knight rely on <u>In re McKenzie Energy Corp</u>., 228 B.R. 854 (Bankr. S.D. Tex. 1998).  However, like <u>Lippe</u>, <u>McKenzie Energy</u> does not support dismissal of the Trustee's and AIPC's section 547-549 claims.  In <u>McKenzie Energy</u>, two entities held independent fraudulent transfer claims, but one of the two entities had executed a release of its claim.  The court ruled that the fraudulent transfer claims were not "merged" as a result of a finding that one entity was the alter ego of the other, and, accordingly, the release was not binding on both entities.  <u>McKenzie Energy</u>, 228 B.R. at 869-70 ("The collapsing of the bankruptcy estates and liabilities of MMC and Michael McKenzie into one entity does not serve to merge the two separate assets of the estates into one asset").  This issue – whether two causes of action are "merged" by an alter ego finding – is not the same issue presented by the

---

[8]The <u>ASARCO</u> court declined to apply <u>Southmark</u> on the grounds that its holding is "non-precedential" under 5th Cir. R. 47.5.4, and because it is in "direct tension" with published Fifth Circuit case law.  <u>See</u> <u>ASARCO</u>, 382 B.R. at 67 n.9 (noting that <u>S.I. Acquisition</u>, 817 F.2d at 1152 "supports the availability of a veil-piercing argument to enlarge the potential estate of the corporation whose veil is being pierced"); <u>see also</u> <u>In re Schimmelpenninck</u>, 183 F.3d 347, 358 (5th Cir.1999).

Trustee and AIPC in the instant case. The Trustee and AIPC are not seeking to merge "two separate assets of the estate into one asset," but are seeking to use the alter ego doctrine to establish that AIPC had an interest in the property of AIPK.

Moreover, as the Trustee points out in his brief, some of the language in the McKenzie Energy case actually supports the Trustee's standing argument. Specifically, the McKenzie Energy court recognized that an alter ego finding expands the debtor's estate to include the assets of the debtor's alter ego. McKenzie Energy, 228 B.R. at 869-70. Taking this analysis to the next step, if the estate includes the assets of an alter ego, a pre-petition transfer of the assets of an alter ego would be subject to an avoidance action by the debtor (or a trustee) because the transfer deprives the estate of assets that, but for the transfer, would have been available to the debtor's creditors. See Begier, 496 U.S. at 58; In re Southmark. 40 F.3d 1111, 1116-17 (5th Cir. 1995).

After reviewing and considering the authorities cited by the parties and applicable Nevada law, the court concludes that the approach adopted in ASARCO is more consistent with Nevada's alter ego doctrine. Assuming that the Trustee and AIPC have adequately pled the elements of an alter ego claim under Nevada law (and that they are not estopped from relying on the doctrine, as discussed below), their section 547-549 claims are not precluded as a matter of law.

-37-

**4. Are AIPC and The Trustee Estopped From Relying on the Alter Ego Doctrine?**

Bridge and Knight argue in the alternative that the Trustee and AIPC are estopped from asserting the alter ego doctrine based upon AIPC's conduct before and during the bankruptcy case. Bridge and Knight argue that AIPC "deliberately established AIPK to hold assets separate from the debtor," that "only the debtor elected to file for bankruptcy," and that debtor's "plan of reorganization does not provide for the payment of the debtor's creditors from AIPK's assets, nor does it provide to creditors of AIPK to file claims against the debtor's assets." Bridge and Knight further contend that the Trustee and AIPC are judicially estopped from relying on the alter ego doctrine because AIPC's bankruptcy filings acknowledge the separateness of AIPK and AIPC. In that regard, Bridge and Knight request that the court take judicial notice of the Confirmed Plan and other filings in the bankruptcy case.

As a threshold matter, the court will address Bridge's and Knight's request that the court take judicial notice of the documents filed in connection with the underlying bankruptcy case. The court's October 1st Amended Order originally denied this request for judicial notice. After further consideration, the court concludes that the request for judicial notice should be granted. Courts normally must limit their inquiry to the facts stated in the complaint and the documents incorporated by the complaint in

-38-

deciding a motion to dismiss for failure to state a claim. Courts may also consider matters of which they may take judicial notice. See Fed. R. Evid. 201(b) and (d) ("A court shall take judicial notice if requested by a party and supplied with necessary information."); Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996). A court may take judicial notice of matters that are of public record, including pleadings that have been filed in a federal or state court. See Cisco Systems, Inc. v. Alcatel USA, Inc., 301 F. Supp.2d 599, 602 n.3 (E.D. Tex. 2004). The pleadings on file in AIPC's bankruptcy case satisfy the requirements of Rule 201, and Bridge and Knight have supplied the information necessary for the court to take judicial notice of these pleadings. Specifically, the court will take judicial notice of (1) the Confirmed Plan of Reorganization [Docket No. 557]; (2) the Motion to Sell [Docket No. 267]; (3) the Amended Motion to Sell [Docket No. 298]; (4) the Sale Order [Docket No. 349]; and (5) the Disclosure Statement [Docket No. 463]. Consideration of these pleadings does not convert the Motions into motions for summary judgment. The Second Amended Order entered contemporaneously with these Reasons for Decision reflects the court's ruling on the request for judicial notice.

The court will first address Knight's and Bridge's judicial estoppel argument. A party "who assumes one position in its pleadings is estopped from asserting a contrary position in a

-39-

subsequent proceeding if: (1) the position of the party to be estopped is clearly inconsistent with its previous one; (2) the party convinced the court in the previous proceeding to accept its position; and (3) the party asserted the prior position intentionally rather than inadvertently." In re Miller, 347 B.R. 48, 54 (Bankr. S.D. Tex. 2006). Applying these elements to the present case, the contents of the pleadings judicially noticed from AIPC's bankruptcy case cannot estop the Trustee from asserting the alter ego doctrine. In Miller, the court addressed whether the debtor's failure to disclose a cause of action in his schedules estopped the trustee from pursuing those claims. The court concluded that judicial estoppel did not apply to the trustee because the trustee never took a "contrary position":

> [J]udicial estoppel might apply to Debtor. But the party seeking to reopen this bankruptcy case is the Trustee, and the Trustee did not make the statement about which Merck complains. The Trustee did not file the schedules. The Trustee is not judicially estopped from reopening this case by a "contrary position" by the Debtor. In short, the Court cannot see any "contrary position" that the Trustee may have taken.

347 B.R. at 54. The same reasoning applies to the present case. Given that the Trust was not created and the Trustee was not appointed until confirmation, the Trustee cannot be charged with any of the positions taken in the pleadings filed by the Debtor prior to confirmation. See In re Broussard, 351 B.R. 383, 387-88 (Bankr.

-40-

W.D. La. 2006); <u>In re Knippers</u>, No. 00-12491, 2004 WL 3244581 at *5-6 (Bankr. M.D. La. Sept. 29, 2004). To the extent that Bridge and Knight seek to "impute" the representations in pre-confirmation filings to the Trustee, nothing in the case law on judicial estoppel supports this broad application of the doctrine. <u>See</u>, <u>e.g.</u>, <u>In re Quarles</u>, No. 06-CV-0137-CVE-SAJ, 2007 WL 171913 at *6-7 (N.D. Okla. Jan. 18, 2007) (affirming bankruptcy court's ruling that knowledge and conduct of debtor could not be imputed to the trustee for purposes of applying judicial estoppel). Nor would the court be inclined to apply the doctrine in such a way that the pre-appointment conduct of the debtor could be used to unduly limit the ability of an appointed bankruptcy trustee to administer the estate.

Furthermore, Bridge and Knight have not established that the contents of the pleadings filed in the bankruptcy case, taken as whole, are "clearly inconsistent" with the assertion of the alter ego doctrine in the present proceeding. The fact that an alter ego nominally owns an asset does not preclude application of the alter ego doctrine to pierce the corporate veil and to bring that asset into the bankruptcy estate. <u>Western World Funding, Inc.</u>, 52 B.R. at 783. Accordingly, the fact that the pleadings filed in the bankruptcy case identify AIPK as the owner of CGC is not "clearly inconsistent" with a claim that AIPK is an alter ego of AIPC.

-41-

Nor is the characterization of AIPC and AIPK in the Debtor's bankruptcy filings clearly inconsistent with the assertion of the alter ego doctrine. While the Confirmed Plan, Disclosure Statement, and Amended Motion to Sell describe CGC as an asset of AIPK, these documents also characterize AIPK's holding of CGC as "substantially all the value of **AIPC**." See Amended Motion to Sell [Docket No. 298] (emphasis added). The sale of the remaining shares of CGC was also a central component of the Confirmed Plan, and the Plan and the Disclosure Statement explain that the proceeds from that sale would be the primary source of funds distributed under the Plan. See Confirmed Plan at 10-11, 18 [Docket No. 557]; Disclosure Statement at 22, 28-29 (proceeds from the sale of the remaining shares of CGC "to fund the Plan and the Liquidation Trust.") [Docket No. 463]. While AIPC took the position in the Amended Motion to Sell that court approval of the sale was unnecessary because CGC was an asset of AIPK, the Motion alternatively requested approval of the sale under section 363(b) of the Code as a sale of property of AIPC's bankruptcy estate. The court ultimately entered an order approving the sale under section 363(b) on the grounds that the sale was "in the best interests of AIPC, its estate, creditors, and all parties in interest." See Sale Order [Docket No. 349]. Accordingly, considering the contents of these pleadings in their entirety, the statements of AIPC and the positions that it took in connection with

-42-

confirmation are not "clearly inconsistent" with AIPC's reliance on the alter ego doctrine.

Bridge and Knight also argue that it is inequitable to allow the Trustee and AIPC to pursue an avoidance action under the aegis of the alter ego doctrine when AIPK did not file for bankruptcy. In other words, AIPC should not benefit from treating AIPK as a separate, non-filing subsidiary, but then bring AIPK's assets into the bankruptcy through the alter ego doctrine when it suits the Debtor's purpose. At its core, Bridge's and Knight's argument is an argument about the equity of applying the alter ego doctrine to the facts of this case. Prejudice to innocent creditors is a critical factor considered by bankruptcy courts in determining whether to order substantive consolidation. Similarly, potential prejudice to innocent parties and creditors is a factor that must be taken into account by the court in determining whether to pierce the corporate veil in the context of a bankruptcy case. See, e.g., In re Moore, 379 B.R. 284, 295-96 (Bankr. N.D. Tex. 2007). However, Bridge and Knight have not identified (much less established as a matter of law) any such prejudice based upon the Complaint and the pleadings judicially noticed from the bankruptcy case. While Bridge and Knight may ultimately establish that the application of the alter ego doctrine would be inequitable, the court cannot make this determination based solely upon the pleadings.

-43-

### 5. Have AIPC and The Trustee Adequately Pled the Elements of an Alter Ego Claim?

As a final matter, Bridge and Knight argue that AIPC and the Trustee have failed to adequately plead the elements of an alter ego claim. Nevada's alter ego doctrine requires the proponent to establish that (1) one entity is influenced and governed by another individual or entity asserted to be its alter ego; (2) that there is such a unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the fiction of separate entities would "under the circumstances, sanction a fraud or promote injustice." In re National Audit Defense Network, 367 B.R. 207, (citing Frank McCleary Cattle Co., 317 P.2d at 959 (Nev. 1957)). The elements of the doctrine set out in the Frank McCleary Cattle case were subsequently codified by the Nevada legislature, but remain essentially the same. See Nev. Rev. Stat. 78.747 (2007). As far as the applicable pleading standard, Plaintiffs' alter ego allegations are governed by the notice pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure. This standard is satisfied if Plaintiffs' allegations give Defendants "fair notice of what the claim is and the grounds upon which it rests." Conley, 355 U.S. at 47.[9]

---

[9]Although Nevada's formulation of the elements for an alter ego claim refer to fraud, Nevada courts have generally held that fraud is not a required element of an alter ego claim.

-44-

The Complaint in the present case alleges that "AIPC and AIPK operated as a single business enterprise, sharing officers and directors." Complaint at ¶¶ 30-31. Plaintiffs also allege that "AIPK's offices were the same offices as AIPC's and their officers, directors and management were virtually identical." ¶ 29. Finally, as Plaintiffs point out in their response, the Disclosure Statement judicially noticed by the court supports their contention that AIPC and AIPK operated as a single enterprise because all the value of AIPC consisted of the holdings of AIPK:

> [T]he Debtor now has only one asset...that can reasonably be expected to have value, now and in the future. That asset is the ownership, through its wholly owned subsidiary American International Petroleum Kazakhstan ("AIPK") of 15% of the issued and outstanding common stock of Caspian Gas Corp., a New York corporation ("CGC"). CGC owns 100% interest in License 1551 a 264,000 - acre gas field called the Shagyrly-Shomyshty Gas Field, in Kazakhstan (the 'SS Field')."

See Plaintiffs' Response at 12. After considering the Complaint and the matters upon which the court may take judicial notice, the court concludes that Plaintiffs' alter ego allegations satisfy the requirements of Rule 8(a).

---

Accordingly, alter ego allegations need not comply with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.

-45-

**6. Plaintiffs' Section 547-549 Claims Survive the Motions to Dismiss.**

The court concludes that the Trustee and AIPC are not barred from pursuing claims under sections 547-549 at the pleading stage. If the Trustee and AIPC establish that AIPK was an alter ego of AIPC, then AIPC had an interest in the property of AIPK under Nevada law, and thus AIPC and the Trustee have standing to challenge the pre-petition sale of CGC. It is important to note here that the court's ruling on the Motions does not reflect whether the plaintiffs will ultimately prevail on the merits after the opportunity for discovery. The Trustee and AIPC bear a heavy burden in establishing that AIPK was an alter ego of AIPC, which is a threshold requirement for their claims under sections 547-549. The application of the alter ego doctrine often poses problems for courts because the elements of the doctrine are open-ended, and the jurisprudence construing these elements provides little in the way of bright-line standards for applying the doctrine. Despite the open-ended nature of the alter ego doctrine, courts rarely find grounds to invoke the doctrine. <u>See</u>, <u>e.g.</u>, <u>AE Restaurant Associates, LLC v. Giampietro (In re Giampietro)</u>, 317 B.R. 841, 846 (Bankr. D. Nev. 2004) (observing that the alter ego doctrine is "like lightning, it is rare, severe, and unprincipled.") (quoting Frank Easterbrook & Daniel R. Fischel, "Limited Liability and The

-46-

Corporation," 52 U. Chi. L. Rev. 89 (1985)). Accordingly, Bridge and Knight may ultimately defeat AIPC's and the Trustee's alter ego claims – and, by extension, their section 547-549 claims. The court cannot, however, preclude these claims as a matter of law at the pleading stage.

    D.  **<u>REMAINING RELIEF REQUESTED IN THE MOTIONS</u>.**

The Motions also seek relief with respect to Counts 14 (misappropriation) and 21 (debt). These claims are subject to Rule 8(a). After reviewing the allegations in the Complaint, the court concludes that Plaintiffs' allegations give Defendants fair notice of the basis of these claims, and that these claims are not barred as a matter of law.

The director defendants also move to compel initial disclosures. In light of the court's rulings with respect to the request for a more definite statement under Rule 12(e), this request is premature and will be denied without prejudice.

## CONCLUSION

For the foregoing reasons, the court **GRANTS** the Motions in part and **DENIES** the Motions in part. A separate order in conformity with the foregoing reasons has this day been entered into the record of this proceeding.

###