**SO ORDERED.**

**SIGNED December 22, 2009.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

IN RE:

AMERICAN INTERNATIONAL REFINERY          CASE NO. 04-21331
AMERICAN INTERNATIONAL PETROLEUM         CASE NO. 04-21332

    Debtors                              Chapter 11

-----------------------------------------------------------------

JASON SEARCY, TRUSTEE, ET AL

    Plaintiffs

VERSUS                                   ADV. NO. 06-2018

JAMES KNIGHT, ET AL

    Defendants

-----------------------------------------------------------------
REASONS FOR DECISION
-----------------------------------------------------------------

The present adversary proceeding was commenced by American

International Petroleum Corporation ("AIPC" or "Debtor"), American

International Petroleum Kazakhstan ("AIPK"), and Jason Searcy as

the Trustee of the American International Petroleum Corporation Liquidating Trust (the "Trust"). Mr. Searcy subsequently withdrew and Robbye Waldron was appointed Trustee. Plaintiffs assert an array of fraud, contract, fiduciary duty, conversion, and federal and state fraudulent transfer claims against defendants Bridge Hydrocarbons LLC ("Bridge"), Petrocaspian, LLC, Caspian Gas Corp., Lemington Investments, LTD., Baring Vostok Capital Limited Partners, Bank Turanalem, and seven former officers and directors of AIPC (collectively, "Defendants"). Defendant Baring Vostok Capital Limited Partners ("Baring Vostok") filed the present Motion to Dismiss Adversary Proceeding for Lack of Personal Jurisdiction, for Insufficient Service of Process, and for Failure to State a Claim (the "Motion to Dismiss"). The court previously denied the Motion to Dismiss to the extent that it sought dismissal for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Following an evidentiary hearing on personal jurisdiction, the court took the Motion to Dismiss under advisement. After considering the record, the relevant authorities, and the arguments of counsel, the court rules as follows.

## JURISDICTION

This case has been referred to this court by the Standing Order of Reference entered in this district which is set forth as

-2-

Rule 83.4.1 of the Local Rules of the United States District Court for the Western District of Louisiana. No party in interest has requested a withdrawal of the reference. The court finds that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). These Reasons for Decision constitute the court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### 1. AIPC and AIRI

AIPC historically operated through wholly-owned subsidiaries. Through its subsidiaries, AIPC refined crude oil feed stock, produced, processed and marketed products at its Lake Charles, Louisiana refinery, and engaged in oil and gas exploration and development in western Kazakhstan. Debtor AIRI is a wholly-owned subsidiary of AIPC. According to the Debtors' Disclosure Statement, none of AIPC's subsidiaries were conducting any ongoing operations as of the date AIPC and AIRI filed for bankruptcy relief.

### 2. Baring Vostok Capital Partners Limited

Baring Vostok is governed by Guernsey law and its legal address is in Guernsey. (Declaration of Andrey Costyashkin

-3-

("Costyashkin Dec.") at ¶¶ 3,4.)[1]  Baring Vostok manages three private equity funds:  Baring Vostok Private Equity Fund III L.P. 1, Baring Vostok Private Equity Fund III L.P.2, and Baring Vostok Fund III Co-Investment L.P.  Baring Vostok focuses on investments in the former Soviet Union. (Deposition of Alexander Drozdkov ("Drozdkov Dep.") at 202.)[2]  Baring Vostok has no offices, assets, employees, or customers in the United States. (Costyashkin Dec. at ¶¶ 5,8.)  The sole stockholder of Baring Vostok is an entity incorporated in the British Virgin Islands.  (Costyashkin Dec. at ¶ 3.)

### 3.   AIPK and the Kazakh Gas Concessions (Licenses 1551 and 953)

Plaintiffs' claims center on one of AIPC's non-filing subsidiaries, AIPK.  AIPC formed AIPK to hold assets related to its exploration and development activities in Kazakhstan.  At the time the bankruptcy case was commenced, AIPK's primary assets were (1) a 30-year license agreement with the government of Kazakhstan covering the Shagyrly-Shomyshty gas field in Kazakhstan ("License 1551"); and (2) 95% of the outstanding shares of Too Med Shipping

---

[1] The declaration of Andrey Costyashkin is in the record as Tab F to Hearing Exhibit 1, which has been admitted as stipulated by the parties.

[2] The deposition of Alexander Drozdkov is in the record as Tab C to Hearing Exhibit 1.

-4-

Usturt Petroleum Limited ("MSUP"), which in turn owned 100% of another Kazakh gas concession ("License 953").

### 3. The 2003 - 2004 Transactions Challenged by Plaintiffs

Plaintiffs' claims center on a series of pre-petition transactions occurring in late 2003 and early 2004. In October 2003, Caspian Gas Corporation ("Caspian Gas") was created as a wholly-owned subsidiary of AIPK, and License 1551 was transferred to Caspian.[3] (Complaint at ¶¶ 37, 38.)[4] Caspian Gas is a New York corporation, but has no offices outside Kazakhstan. (Drozdkov Dep. 209-210.) In January 2004, AIPC and AIPK transferred 85% of the outstanding stock of Caspian Gas to Bridge. (Complaint at ¶ 38.) Bridge is a New York limited liability company, but its operations are concentrated outside the United States. Bridge maintains an office in New York staffed by its operating manager, Thomas Sima.

---

[3] Although the financial statements and schedules filed by AIPC in the bankruptcy case identify AIPK as the owner of CGC, Plaintiffs contend that AIPK's assets were held by AIPK as the trustee, nominee, and/or agent of AIPC, and that any assets held by AIPK were held by AIPK in name only. (Complaint at ¶¶ 45, 47.) Plaintiffs also allege that AIPK was a mere conduit and alter ego of AIPC, and that AIPC and AIPK operated as a single business enterprise, sharing officers and directors. (Complaint at ¶ 45.)

[4] References to the "Complaint" mean the First Amended Complaint filed September 12, 2008.

06-02018 - #330  File 12/22/09  Enter 12/22/09 16:01:57  Main Document  Pg 5 of 32

(Deposition of Thomas Sima ("Sima Dep.") at 24, 27.)[5]  Mr. Sima testified that his duties are entirely ministerial, and that he acts only at the direction of Bridge's members. (Sima Dep. at 28, 38, 94.)

In exchange for this 85% stake in Caspian Gas, Bridge paid AIPC and AIPK approximately $5 million, and agreed to (1) maintain a $50 million line of credit and (2) obtain $189 million in financing for the development of License 1551.  (Complaint at ¶¶ 38-39.)  Baring Vostok's investment director, Alexander Drozdkov, testified that Baring Vostok was not aware of the sale of Caspian to Bridge until July 2004, when Baring Vostok was approached about an investment in Bridge.

### 3.  Baring Vostok Invests in Bridge and Extends Credit to Caspian Gas in 2005

In July 2004, Baring Vostok was approached about an investment in Bridge.  Prior to this initial contact, Baring Vostok had no relationship with Bridge, Caspian Gas, or any of the other defendants in this case.  (Drozdkov Dep. at 205-208; Sima Dep. at 264-265.)  In March 2005, the three funds managed by Baring Vostok agreed to purchase a 30% ownership interest in Bridge, and the transaction closed in April 2005.  In June 2005, Baring Vostok

---

[5] The deposition of Thomas Sima is in the record as Tab B to Hearing Exhibit 1.

entered into a credit agreement with Caspian Gas (the "Credit Agreement") and agreed to lend Caspian Gas up to $22,046,000. (Drozdkov Dep. at 97.)[6]  In return, Baring Vostok was allowed to select one member of Caspian Gas' five-member Board of Directors. (Drozdkov Dep. at 98.)  Neither Baring Vostok nor Baring Vostok's three funds received any stock in Caspian Gas.

### 4.  AIPC and AIRI File For Relief Under Chapter 11 and Sell AIPK's Remaining Stake in CGC and License 1551

AIPC and AIRI filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 7, 2004, and the cases were administratively consolidated.  On December 12, 2005, AIPC filed a motion under 11 U.S.C. § 363 requesting court approval to sell AIPK's remaining 15% stake in CGC to Polgraft Oil Ltd. (which is not a party in this case) for $16 million (the "Motion to Sell") [Docket No. 267].  After a hearing on the matter, the court entered an order on February 9, 2006, approving the sale of AIPK's remaining interest in CGC under sections 363(b) and 363(f) (the "Sale Order").[7]  The court found that the purchase price was "reasonably equivalent value and fair consideration under the Bankruptcy Code and any applicable non-bankruptcy law." (Sale Order at 4.)  The court also found that the sale was "in the best

---

[6] A copy of the Credit Agreement is in the record as Exhibit 29 of the Drozdkov deposition (Tab C to Hearing Exhibit 1).

[7] The Sale Order is designated as docket entry number 349.

interests of AIPC, its estate, creditors, and all parties in interest." (Sale Order at 3.)

**5.    The Trustee Commences the Present Adversary Proceeding**

The Trustee, AIPC, and AIPK filed the present adversary proceeding on October 6, 2006. The Complaint asserts twenty-six claims, including fraud, fraudulent inducement, breach of fiduciary duty, fraudulent and preferential transfers under the Bankruptcy Code and state law, promissory estoppel, negligence and gross negligence, conversion, and conspiracy. In addition to naming Bridge and Baring Vostok, the Complaint names as defendants Caspian Gas, Petrocaspian, LLC, Lemington Investments, Bank Turanalem, and seven former officers and directors of AIPC. Plaintiffs' claims center on the 2004 sale of 85% of AIPK's stake in Caspian Gas to Bridge. Specifically, Plaintiffs allege that AIPC obtained inadequate consideration for this 85% stake, and that the officer and director defendants breached their duties and committed fraud in connection with the sale. The Complaint also alleges that the 2004 transaction is avoidable as a preference or fraudulent transfer under 11 U.S.C. §§ 548, 547, 549, and 550.

Baring Vostok filed the present Motion to Dismiss in April 2008, and the court initially heard the motion on May 29, 2008. During the hearing, the court indicated that Plaintiffs had not met their *prima facie* burden of establishing personal jurisdiction over

-8-

Baring Vostok based on allegations in the Complaint and the record before the court. Specifically, Plaintiffs had not shown any connection between Baring Vostok and the 2003 - 2004 transactions, or that Baring Vostok received any property of the estate in connection with those transactions. However, given that Plaintiffs requested the opportunity for jurisdictional discovery, the court continued the hearing. The court subsequently granted Plaintiffs discovery and allowed Plaintiffs to supplement the record with the results of this discovery. The parties conducted jurisdictional discovery from July 2008 through January 2009. The court held an evidentiary hearing on Baring Vostok's motion on July 1, 2009. The court then took the matter under advisement following the submission of post-hearing briefing by the parties.

## DISCUSSION

**A. The Procedure and Burden of Proof for Challenging Personal Jurisdiction.**

As a preliminary matter, Plaintiffs contend that they need only make a *prima facie* showing that the court has personal jurisdiction over Baring Vostok. Baring Vostok counters that Plaintiffs must establish grounds for personal jurisdiction by a preponderance of the evidence. Absent an evidentiary hearing, a plaintiff need only establish a *prima facie* case for personal

-9-

jurisdiction.  Felch v. Transportes Lar-Mex SA De CV, 92 F.3d 320, 326 (5th Cir. 1996).  When determining a motion to dismiss for lack of personal jurisdiction at the pleading stage, jurisdictional allegations should be accepted as true and relevant factual disputes should be resolved in the plaintiff's favor.  Fielding v. Hubert Burda Media, Inc., 415 F.3d 419, 424 (5th Cir. 2005); Guidry v. U.S. Tobacco Co., 188 F.3d 619, 626 (5th Cir. 1999).  Where, as here, the defendant disputes the plaintiff's jurisdictional allegations, the plaintiff cannot rely solely on unsupported allegations in the complaint.  Ordinarily, the court will accept affidavits, discovery responses, and other materials supporting the plaintiff's jurisdictional allegations.  Courts also have discretion to allow jurisdictional discovery.  Astropower Liquidating Trust v. Xantrex Technology, Inc. (In re Astropower Liquidating Trust), 2006 WL 2850110 (Bankr. D. Del. Oct. 2, 2006) ("It is within the court's discretion to permit discovery when jurisdictional facts are disputed.").  A plaintiff ultimately bears the burden of proving personal jurisdiction by a preponderance of the evidence.  If a court allows jurisdictional discovery and allows a pre-trial evidentiary hearing on personal jurisdiction "where both sides have the opportunity to present their cases fully," a court may decide whether the plaintiff has established personal jurisdiction by a preponderance of the evidence.  Walk

-10-

<u>Haydel & Associates, Inc. v. Coastal Tower Production Co.</u>, 517 F.3d 235, 241-242 (5th Cir. 2008).

Plaintiffs contend that they need only satisfy the lower *prima facie* standard because the court limited their jurisdictional discovery. The court disagrees. Courts have considerable discretion in fashioning appropriate limits on discovery, especially in cases where, as here, discovery involves foreign defendants over whom the plaintiffs have not yet established even *prima facie* grounds for personal jurisdiction. <u>Alpine View Company Ltd. v. Atlas Copco AB</u>, 205 F.3d 208, 220 (5th Cir. 2000). In the present case, the court initially granted limited jurisdictional discovery in the form of twenty interrogatories and one Rule 30(b)(6) deposition of a corporate representative of Baring Vostok. Plaintiffs subsequently served four interrogatories on Bridge and sixteen interrogatories on Baring Vostok. The court later expanded discovery by ordering Bridge to produce "due diligence" documents provided to Baring Vostok prior to the 2005 transactions in which Baring Vostok purchased a membership interest in Bridge. Documents maintained by both Bridge and Baring Vostok were produced to Plaintiffs pursuant to the court's order. Furthermore, after a December 5, 2008, status conference, the court ordered Bridge and Baring Vostok to each produce a corporate representative for deposition. Accordingly, on January 6, 2009, Plaintiffs deposed

-11-

Thomas Sima in New York, and, on January 22, 2009, deposed Alexander Drozdkov in Moscow. In fashioning jurisdictional discovery, the court limited discovery to the transactions at issue in Plaintiffs' complaint, and denied Plaintiffs' request for additional depositions and discovery on the grounds that the proposed discovery was not narrowly tailored to jurisdiction and appeared to be duplicative of the discovery already completed. Plaintiffs contend that they cannot be held to the higher preponderance of the evidence standard because of these limitations, and cite the Fifth Circuit's decision in *Walk Haydel*. See 517 F.3d. 235. In *Walk Haydel*, the court concluded that the district court erred in holding the plaintiffs to a higher preponderance of the evidence standard because the district court "substantially curtailed" discovery and did not conduct "a full-blown evidentiary hearing." Id. at 242. The district court limited jurisdictional discovery to a document request for a narrow range of documents. The district court did not allow the plaintiffs to take depositions of parties deemed to be essential to the plaintiffs' jurisdictional case. The district court also denied the plaintiffs' request for live testimony in an evidentiary hearing. The Fifth Circuit concluded that in order to hold the plaintiffs to the higher preponderance of the evidence standard, the parties "must be allowed to submit affidavits and to employ all

-12-

forms of discovery, **subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue**." Id. (emphasis added). The court further held that the district court should have entertained live testimony. Id.

The *Walk Haydel* case is distinguishable from the present case. In contrast to *Walk Haydel*, Plaintiffs were given leave to (1) conduct two depositions of the corporate representatives of Bridge and Baring Vostok under Rule 30(b)(6), (2) serve document requests tailored to the specific transactions at issue in the Complaint, and (3) serve 20 interrogatories. The court also ordered the production of due diligence documents requested by Plaintiffs. As far as the conduct of the evidentiary hearing, the court permitted the parties to present testimony at the hearing. By agreement of the parties, this testimony took the form of video excerpts from the depositions conducted by Plaintiffs. *Walk Haydel* does not require a court to grant unfettered discovery before holding a plaintiff to a preponderance of the evidence standard. Rather, the Fifth Circuit's opinion indicates that a court retains the discretion to limit and tailor jurisdictional discovery. Otherwise, the expanded discovery sought by Plaintiffs could impose significant costs on a foreign entity over whom the court may not have personal jurisdiction. Moreover, Plaintiffs never demonstrated that the additional discovery they requested was

-13-

essential to presenting their case on jurisdiction in light of the discovery that had already been completed. Accordingly, Plaintiffs must establish personal jurisdiction by a preponderance of the evidence.

**B.    The Standards Governing Personal Jurisdiction.**

Rule 7004(f) governs personal jurisdiction in bankruptcy court:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of Rule 4 F.R.Civ.P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

Fed. R. Bankr.P. 7004(f). Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure generally limits the *in personam* jurisdiction of a federal court over non-resident defendants to that of a court of general jurisdiction in the forum state. The court's jurisdictional inquiry is thus guided by the forum state's long-arm statute, constitutional limitations based on due process, and the defendant's contacts with the forum. However, this limitation does not apply where extra-territorial service of process is "authorized by a statute of the United States." Fed.R.Civ.P. 4(k)(1)(D). This authority is granted in Bankruptcy Rule 7004(d), which allows nationwide service of process in bankruptcy cases.

-14-

<u>Nordberg v. Granfinanciera, S.A. (In re Chase & Sanborn Corp.)</u>, 835 F.2d 1341, 1344 (11th Cir. 1988) ("Bankruptcy Rule 7004(d) provides for nationwide service of process and thus is the statutory basis for personal jurisdiction in this case...."), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). Accordingly, in bankruptcy cases "the forum" is the United States and courts apply a "national contacts" standard in determining whether a foreign defendant has sufficient contacts with the United States to support personal jurisdiction. <u>Klingher v. SALCI (In re Tandycrafts, Inc.)</u>, 317 B.R. 287, 289 (Bankr. D. Del. 2004).

The Due Process Clause of the Fifth Amendment determines whether these national contacts are sufficient to establish personal jurisdiction over a foreign defendant. <u>Chase & Sanborn</u>, 835 F.2d at 1344. The Fifth Amendment imposes "a general fairness test incorporating *International Shoe's* requirement that certain minimum contacts exist between the non-resident defendant and the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Max Daetwyler Corp. v. Meyer</u>, 762 F.2d 290, 293 (3d Cir. 1985) (quotations omitted) (citing <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." <u>Lewis</u>

-15-

v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001). General jurisdiction exists when a non-resident defendant's contacts with the forum state are substantial, continuous, and systematic. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-19, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); Religious Tech. Ctr. v. Liebreich, 339 F.3d 369, 374 (5th Cir. 2003) (citations omitted). The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." Submersible Sys., Inc. v. Perforadora Cent., S.A., 249 F.3d 413, 419 (5th Cir. 2001) (citation omitted). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction ...." Revell v. Lidov, 317 F.3d 467, 471 (5th Cir. 2002) (citations omitted).

Where the defendant's contacts do not support general jurisdiction, a court may exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." Hall, 466 U.S. at 414 n.8. Specific jurisdiction requires an assessment of the defendant's contacts and the relationship between those contacts and the plaintiff's cause of action. Freudensprung v. Offshore Technical Services, Inc., 379 F.3d 327, 343 (5th Cir. 2004) First, a court must assess the nature of a

-16-

foreign defendant's contacts with the United States to determine whether they satisfy due process. "Random, fortuitous, or attenuated contacts" with the forum are not sufficient to satisfy due process. Moncrief Oil Int'l Inc. v. OAO Gazprom, 481 F.3d 309, 312 (5th Cir. 2007). Similarly, the unilateral acts of the plaintiff or a third party are insufficient to establish minimum contacts. Hydrokinetics, Inc. v. Alaska Mech., Inc., 700 F.2d 1026, 1028 (5th Cir. 1983). A plaintiff must show that a defendant purposely directed its activities toward the United States or purposely availed itself of the privileges of conducting business in the United States. Freudensprung, 379 F.3d at 343. Next, the plaintiff's cause of action must "arise" from the defendant's contacts with the forum. In other words, the plaintiff must establish a nexus between the defendant's contacts with the United States and the causes of action pled in the complaint. See, e.g., Stickel v. Finkelstein (In re Huffy), 358 B.R. 724, 739 (Bankr. S.D. Ohio 2006) (trustee's fiduciary duty, constructive fraud, and fraudulent transfer claims arose from the defendants' contacts with the forum; defendants were officers and employees of the debtor and the plaintiff's claims were "substantially related" to that relationship).

## C. Have Plaintiffs Met Their Burden?

Plaintiffs rely on "specific jurisdiction" as the basis to

exercise personal jurisdiction over Baring Vostok, and point to the following contacts between Baring Vostok and the United States:

1. The restructuring of AIPC and Bridge's purchase of 85% of Caspian Gas in late 2003 and early 2004;

2. Baring Vostok's purchase of a 30% membership interest in Bridge in April 2005;

3. Baring Vostok's extension of credit to Caspian Gas in June 2005;

4. Baring Vostok's alleged participation in the management of Caspian Gas and membership on Caspian Gas' board of directors; and

5. The forum selection clauses in Baring Vostok's agreements with Bridge and Caspian Gas.

For Plaintiffs to prevail, the record must show by a preponderance of the evidence that Baring Vostok had contacts with the forum (the United States), and that these contacts are sufficient to satisfy the "minimum contacts" standard required under *International Shoe*. Plaintiffs must further show that their state law and federal bankruptcy law claims arose from those contacts. <u>Huffy</u>, 358 B.R. at 739.

**1. The 2003 - 2004 Transactions.**

The focus of the state law and federal bankruptcy law claims in the complaint is the series of transactions in 2003 and 2004 that culminated in the sale of 85% of Caspian Gas to Bridge in January 2004. Plaintiffs' preferential and fraudulent transfer claims challenge the creation of Caspian Gas, the transfer of

-18-

License 1551 to Caspian Gas, and the sale of 85% of Caspian Gas to Bridge under 11 U.S.C. §§ 547, 548, 549, and 550. Plaintiffs' breach of fiduciary duty, fraud, and assorted state law claims are similarly grounded in the conduct of AIPC's board and officers in connection with these transactions. For example, Plaintiffs contend that AIPC's officers and directors committed fraud by representing "to AIPC that the transfer was in the best interest of AIPC" and that "AIPC would receive fair market value for the transfer." (Complaint at ¶ 103.) The court concludes that these 2003 – 2004 transactions cannot serve as a basis for personal jurisdiction over Baring Vostok because there is no evidence in the record that Baring Vostok had any connection to these transactions, much less any contacts with the United States sufficient to pass muster under the Due Process Clause. Based on the record, Baring Vostok's first contact with Bridge and Caspian Gas did not occur until months after the 2003 – 2004 transactions were consummated. Baring Vostok did not invest in Bridge until over a year after the sale of 85% of Caspian Gas to Bridge. The record shows no connection between Baring Vostok and Bridge or AIPC at the time of these transactions. Accordingly, Plaintiffs cannot base personal jurisdiction on these transactions.

**2. Baring Vostok's 2005 Investment in Bridge.**

Although the Complaint is primarily grounded on the 2003 –2004 transactions, Plaintiffs also rely on Baring Vostok's 2005 purchase

-19-

of a 30% membership interest in Bridge as grounds for personal jurisdiction. According to Plaintiffs, Baring Vostok purposely directed its activities toward the United States and purposely availed itself of the privileges of conducting business in the United States by investing in a New York limited liability company. Plaintiffs also point to the fact that Baring Vostok was subject to Bridge's Amended Operating Agreement and Membership Purchase Agreement, which are governed by New York law.

A defendant's investment in a company that is based in the forum is generally not a sufficient basis for personal jurisdiction. <u>Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.</u>, 230 F.3d 934, (7th. Cir. 2000) (personal jurisdiction cannot be based on "corporate affiliation or stock ownership alone"); <u>Jones v. Petty-Ray Geophysical, GeoSource, Inc.</u>, 954 F.2d 1061, 1070 (5th Cir. 1992). Accordingly, Baring Vostok's investment in Bridge, standing alone, is not sufficient grounds to exercise personal jurisdiction. Nor is the fact that Baring Vostok was subject to Bridge's Amended Operating Agreement and Membership Purchase Agreement. Plaintiffs were not parties to those agreements, and the claims asserted by Plaintiffs are not based on these agreements. See <u>Freudensprung</u>, 379 F.3d at 344 (plaintiff was not a party to the contract cited as evidence of the defendant's minimum contacts with the forum).

-20-

Plaintiffs, however, contend that Baring Vostok's purchase of a 30% interest in Bridge was an *indirect* transfer of Caspian Gas and License 1551, and that Baring Vostok is liable as a subsequent transferee under 11 U.S.C. § 550. Section 550 provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -- (1) the initial transferee of such transfer or the entity for his benefit such transfer was made; or (2) **any immediate or mediate transferee of such initial transferee**." (emphasis added). According to Plaintiffs, Baring Vostok was the "immediate or mediate" transferee of property of the estate (Caspian Gas and License 1551) from Bridge, the initial transferee. Plaintiffs acknowledge that Baring Vostok never received a direct transfer of Caspian Gas stock or License 1551, but rely on the broad definition of a "transfer" in 11 U.S.C. § 101(54): "The term 'transfer' means ... each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." Based on this definition, Plaintiffs argue that the investment in Bridge was an indirect transfer of Caspian Gas and License 1551 because Baring Vostok was able to exercise dominion and control over this property by virtue of its membership interest in Bridge.

After considering the record and the relevant authorities, the

-21-

court agrees with Baring Vostok that its purchase of a 30%
membership interest in Bridge does not support the exercise of
personal jurisdiction.    There are three primary flaws in
Plaintiffs' jurisdictional theory.  First, Plaintiffs cannot base
a section 550 claim on Baring Vostok's purchase of an interest in
Bridge.    Ordinarily, courts do not consider the merits of a
plaintiff's claims in assessing personal jurisdiction.  However,
the requirement that the plaintiff's claims **arise** from or are
substantially relate to the defendant's contacts with the forum
necessarily requires some assessment of a plaintiff's claims.  If
a defendant's contacts with the forum cannot be a basis for the
plaintiff's claims, these contacts cannot support personal
jurisdiction under the specific jurisdiction prong of the
*International Shoe* line of cases. See, e.g., Moncrief, 481 F.3d at
314 (alleged negligent representations in the forum did not amount
to minimum contacts because the representations failed to support
a claim for negligent misrepresentation).

Here, the specific property transferred to Baring Vostok in
April 2005 – the membership interest in Bridge – is not property
of the bankruptcy estate.  A corporation is a separate legal entity
from its shareholders, and its shareholders do not directly own
(nor do they have the right to control), the corporation's
property.  See Regency Holdings (Cayman), Inc. v. Microcap Fund,

-22-

Inc. (In re Regency Holdings (Cayman), Inc.). 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998). Taking this distinction one step further, the "transfer of the stock of a corporation is not a transfer of the property and assets of the corporation itself." Engel v. Teleprompter Corp., 703 F.2d 127, 131 (5th Cir. 1983); Capital Prks, Inc. v. Southeastern Advertising & Sales System, Inc., 864 F.Supp. 14, 16 (W.D. Tex. 1993) (citing Engel); In re Murchison, 54 B.R. 721, 728 (Bankr. N.D. Tex. 1985) (the assets of a corporation cannot be imputed to shareholders "absent some actual or bookkeeping transfer of the asset from one entity to another.") (quoting Engel). The same principle holds for a New York limited liability company: a member of a New York limited liability "has no interest in a specific property of the limited liability company." NY CLS LLC § 601; Bartfield v. Murphy, 578 F. Supp. 2d 638, 647 (S.D.N.Y. 2008) (members of limited liability company had no claim or interest in the property of the company) (citing NY CLS LLC § 601). Applying these principles here, Baring Vostok's purchase of a 30% membership interest in Bridge did not transfer any interest in Caspian Gas, License 1551, or any other assets owned by Bridge and alleged to be property of the estate. Plaintiffs cannot disregard these corporate distinctions by relying on the broad language of section 101(54). Even with the broad language of section 101(54), courts observe corporate formalities

-23-

in the context of fraudulent transfer claims absent grounds to pierce the corporate veil. <u>See</u>, <u>e.g.</u>, <u>In re Regency Holdings (Cayman), Inc.</u>, 216 B.R. 371, 375-76 (Bankr. S.D.N.Y. 1998) (creditors of parent company could not recover allegedly fraudulent transfers of the property of the parent company's subsidiary: "The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's.") Moreover, even if section 101(54) could be read this broadly, Plaintiffs' "indirect transfer" theory conflicts with Due Process jurisprudence that requires the court to respect corporate formalities in assessing personal jurisdiction absent grounds to pierce the corporate veil. <u>See</u>, <u>e.g.</u>, <u>Alpine View Co. Ltd</u>, 205 F3d at 218-219 (court cannot ignore corporate formalities and impose jurisdiction on a parent company based on the activities of a subsidiary absent a finding of alter ego or other grounds to pierce the corporate veil) Here, the record presents no basis to pierce the corporate veil with respect to Baring Vostok, Bridge, and Caspian Gas.[8]

---

[8] Plaintiffs cite several cases to support an expansive reading of the definition of an "indirect transfer" under section 101(54). None of these cases, however, sanction the use of section 101(54) to effectively pierce the corporate veil where the record did not support a finding of alter ego or other grounds under state law to pierce the corporate veil. Even if these cases could be read this broadly, they cannot support personal jurisdiction consistent with jurisprudence applying the "minimum contacts" standard.

-24-

Second, the record does not support Plaintiffs' contention that Baring Vostok's investment in Bridge allowed it to effectively control License 1551. Under New York law, Baring Vostok's 30% interest in Bridge did not entitle Baring Vostok to manage Bridge's operations or control Bridge's property. <u>Bartfield</u>, 578 F. Supp.2d at 647. Nor does the record include any evidence that Baring Vostok actually controlled or attempted to control activities related to License 1551.

Third, even if Baring Vostok's investment in Bridge could be construed as an indirect transfer of Caspian Gas and License 1551, this transfer alone cannot support personal jurisdiction. The record reflects that Baring Vostok did not initiate the contacts that ultimately led to its 2005 investment in Bridge, but was approached by Bridge. This evidence undercuts Plaintiffs' contention that Baring Vostok purposefully directed its activities at the forum. <u>See</u>, <u>e.g.</u>, <u>In re Astropower Liquidating Trust</u>, 2006 WL 2850110 (Bankr. D. Del. 2006) (foreign defendant "did not reach out to debtor" in connection with an alleged fraudulent transfer, and thus did not purposefully direct its activities at the United States). Moreover, although Bridge is a New York limited liability company, almost all of its operations (including the Shagyrly-Shomyshty gas field, which is the subject matter of License 1551) are located in Kazakhstan, not the United States. When assessing

-25-

minimum contacts with the forum based on a business relationship, courts generally focus on the "hub" of the parties' activities and relationship. See Moncrief Oil, 481 F.3d at 312 (although plaintiff was based in Texas, the "hub" of the parties' activities was outside the forum). Even if Bridge was created under and governed by New York law, the hub of its relationship with Baring Vostok was not the United States: Baring Vostok's and Bridge's operations are located outside the United States, and Bridge's primary assets are located in Kazakhstan. In sum, Baring Vostok's 2005 purchase of an interest in Bridge does not constitute the minimum contacts required to support personal jurisdiction based on the claims asserted by Plaintiffs.

### 3. Baring Vostok's Loan to Caspian Gas.

Plaintiffs also cite the June 16, 2005 Credit Agreement between Baring Vostok and Caspian Gas as grounds for personal jurisdiction. According to Plaintiffs, Baring Vostok "willingly subjected itself to the laws and courts of the forum" as a result of this agreement. (Plaintiffs' March 11, 2009 Memorandum at 18.) The court agrees with Plaintiffs to the extent that the Credit Agreement and $22 million loan to Caspian Gas could support personal jurisdiction for claims arising out of the Credit Agreement. This agreement does not, however, create blanket personal jurisdiction with respect to claims that do not arise from

this loan transaction and are brought by plaintiffs who are not parties to the Credit Agreement. A plaintiff cannot "bootstrap" specific jurisdiction based on contacts that are unrelated to the transactions that form the basis of the plaintiff's claims. <u>See</u>, <u>e.g.</u>, <u>Freudensprung</u>, 379 F.3d at 344. Neither the Complaint nor the record show a "substantial relationship" between the 2005 Credit Agreement and Plaintiffs' claims, which are grounded in the 2003 - 2004 transactions. Nor does the record support a connection between the Credit Agreement and Plaintiffs' claim that Baring Vostok was a subsequent transferee of property of the estate. The record contains no evidence that this 2005 loan transaction involved any transfer of an interest in Caspian Gas or License 1551. Absent this nexus, Plaintiffs cannot base jurisdiction on the mere fact that Baring Vostok entered into a loan agreement with Caspian Gas. <u>Freudensprung</u>, 379 F.3d at 344. ("merely contracting with a resident of the forum is insufficient to subject the non-resident to the forum's jurisdiction"). Moreover, as with Baring Vostok's purchase of a membership interest in Bridge, Baring Vostok did not initiate the contacts that culminated in the Credit Agreement. Bridge and other intermediaries approached Baring Vostok. Accordingly, Baring Vostok did not purposefully direct its activities at the forum in connection with this agreement.

-27-

**4. Baring Vostok's Representation on Caspian Gas' Board of Directors.**

Plaintiffs also attempt to ground personal jurisdiction on Baring Vostok's membership on Caspian Gas' Board of Directors in 2005. This jurisdictional argument, however, suffers from the same flaw as the argument based on the Credit Agreement: Plaintiffs' claims do not arise from Baring Vostok's conduct or actions as a member of Caspian Gas' Board. Baring Vostok joined Caspian Gas' Board over a year after the 2004 transactions that are the focus of the Complaint. Plaintiffs point to this Board membership as evidence that Baring Vostok effectively controlled Caspian Gas and License 1551. The record simply does not support Plaintiffs' argument. Putting aside the fact that Baring Vostok and Caspian Gas were distinct corporate entities, Baring Vostok controlled only one seat on a five member board of directors. Plaintiffs have not provided a plausible explanation of how, under New York law, Baring Vostok exercised extensive dominion and control over Caspian Gas and License 1551 based on this one board seat, nor does the record include any evidence that Baring Vostok exercised any such control.

Plaintiffs also cite a legal analysis of AIPC's bankruptcy and potential fraudulent transfer claims that was distributed to members of Caspian Gas' board in August 2005, and argue that it was foreseeable that Baring Vostok could face suit in the United States based on these claims. (August 4, 2005 Memorandum Prepared by

-28-

Curtis, Mallet-Provost, Colt & Mosle LLP (the "Curtis Mallet Memorandum").)[9] Plaintiffs are correct that the foreseeablity of suit in the forum is a factor courts consider as part of the "minimum contacts" analysis. Foreseeablity is a factor that weighs in favor of a finding of minimum contacts. However, foreseeability alone is not sufficient to support personal jurisdiction. See Moncrief, 481 F.3d at 313 ("Mere foreseeability, standing alone, does not create jurisdiction"). Foreseeability comes into play when a defendant has purposefully directed its activities at the forum and the plaintiff's claims are based on those activities. Under these circumstances, courts have held that it is "foreseeable" that the defendant would be subject to litigation in the forum based on those activities. With respect to the Curtis Mallet Memorandum, the memorandum merely discusses claims arising from the 2003-2004 transactions. As explained previously, the record does not support a connection between Baring Vostok and these transactions. The mere receipt of this memorandum did not create any independent causes of action in favor of Plaintiffs, nor did it create, *post hoc*, a connection between Baring Vostok and the 2003-2004 transactions. In sum, Baring Vostok's membership on Caspian Gas' Board does not support the exercise of personal jurisdiction.

---

[9] A copy of the Curtis Mallet Memorandum is in the record as Exhibit 27 of the Drozdkov deposition (Tab C to Hearing Exhibit 1).

**5. The Forum Selection Clause in Baring Vostok's Agreement with Bridge.**

Finally, Plaintiffs contend that the forum selection clauses in the 2005 Credit Agreement and Bridge's Amended Operating Agreement and Membership Purchase Agreement provide a basis for personal jurisdiction. These clauses consent to jurisdiction in New York. For example, the forum selection clause in the Credit Agreement states:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York and the parties hereto hereby irrevocably submit [sic] the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in The City of New York.

Due process is generally satisfied when a defendant "consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause." <u>Dominium Austin Partners, L.L.C. v. Emerson</u>, 248 F.3d 720, 726 (8th Cir. 2001). The scope of a forum selection clause, however, is generally limited to the parties to the agreement, and to disputes that arise out of or relate to the contract containing the forum selection clause. <u>See</u>, <u>e.g.</u>, <u>Fatboy USA, L.L.C. v. Schat</u>, 2009 WL 3756947 at *4 n.3 (M.D.N.C. 2009). The court agrees with Baring Vostok that the forum selection clauses in the 2005 Credit Agreement and Bridge's Amended Operating Agreement and Membership Purchase Agreement do not support personal jurisdiction. Plaintiffs are not parties to these agreements, and

-30-

are not seeking to enforce the terms of the agreements. <u>See</u> <u>Freudensprung</u>, 379 F.3d at 344 (plaintiff was not a party to the contract cited as evidence of the defendant's minimum contacts with the forum). The agreements were entered into over a year after the 2003-2004 transactions that are the focus of Plaintiffs' claims. There simply is no nexus between these agreements and the 2003-2004 transactions sufficient to establish personal jurisdiction over Baring Vostok.

<b>CONCLUSION</b>

For the foregoing reasons, the court concludes that Plaintiffs have not proven by a preponderance of the evidence that the court may exercise personal jurisdiction over Baring Vostok. Plaintiffs' claims are squarely rooted in 2004 sale of Caspian Gas to Bridge. Bridge retains the ownership of 85% of Caspian Gas and License 1551, and Bridge is party in this case subject to the jurisdiction of this court. Accordingly, Plaintiffs still possess whatever remedies they may have under federal and state law with respect to Bridge. The court grants Baring Vostok's Motion to Dismiss for lack of personal jurisdiction. In all other respects, Baring Vostok's Motion to Dismiss is denied as moot. All claims against Baring Vostok are dismissed with prejudice. The court has previously entered an order in connection with these Reasons for Decision.

###